RAPHAEL v. RIO GRANDE WESTERN RY. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. July 28, 1904.)

No. 1,824.

1. EQUITY—RIGHT TO IMPEACH FORECLOSURE SALE OF RAILROAD—LACHES.

One who purchased second mortgage bonds of a railroad company, for a merely nominal price, 18 years after a first mortgage had been foreclosed and the property sold in proceedings which were public, and without fraud, and who made no inquiries, although the unpaid interest coupons were attached to many of the bonds, and all the facts could have been readily

ascertained, has no standing in equity as an innocent purchaser to impeach the validity of the foreclosure sale on the ground of technical irregularities as against a new company which had purchased the property, improved it at large expense, and had included it in a mortgage securing bonds of its own issue.

Appeal from the Circuit Court of the United States for the District of Utah.

In 1873 the Wasatch & Jordan Valley Railroad Company, a corporation of the territory of Utah, mortgaged its property and franchises to secure an issue of its first mortgage bonds aggregating more than $300,000. In 1874 the Bingham Canyon & Camp Floyd Railroad Company, also a corporation of the territory of Utah, mortgaged its property and franchises to secure an issue of $300,600 of its first mortgage bonds. The railroads of these companies connected at Sandy Station, in Salt Lake county, Utah; that of the Wasatch Company extending eastward from that point about 15 miles, and that of the Bingham Company extending westward about 20 miles. In 1879 the two companies effected a consolidation, and the new or consolidated company assumed the name of the Wasatch & Jordan Valley Railroad Company. In the same year the new Wasatch Company executed to the Union Trust Company of New York, as trustee, a mortgage upon the railroads, property, and franchises which had theretofore belonged to its constituent companies, to secure an authorized issue of 1,200 bonds, each of the denomination of $1,000. This mortgage was subject to each of those above mentioned. Only 884 of these second mortgage bonds were ever certified and issued, and Nathaniel W. Raphael was the owner of 579 of them when he instituted this suit. In 1881 the trustees of the Bingham and old Wasatch underlying mortgages, by virtue of the powers expressed in those instruments, took possession of the two railroads, and, proceeding separately, advertised and sold them. It was alleged that each company had defaulted in the payment of the interest coupons attached to its bonds, and that conformably with the provisions of the respective mortgages the bonds themselves became due, and the duty of sale devolved upon the trustees. Deeds of conveyance were thereupon made by the trustees to the Denver & Rio Grande Western Railway Company. In 1889 the Rio Grande Western Railway Company succeeded the Denver & Rio Grande Western in the ownership and possession of the properties mentioned. In the same year it executed to the Central Trust Company of New York its first mortgage upon its property and franchises, including the two lines of railroad in question, to secure an issue of sixteen million dollars of bonds, and in 1899 it executed to the Morton Trust Company of New York (then known as the State Trust Company) another mortgage thereon to secure an issue of between twelve and thirteen million dollars. In 1899 Nathaniel W. Raphael purchased in New York 579 of the bonds of the new or consolidated Wasatch Company. The bonds purchased by Raphael aggregated in amount $579,000, and to most of them were attached 20 years of defaulted coupons. The Union Trust Company, the trustee in the mortgage given to secure these bonds, declined to bring suit at Raphael's request. Consequently, on January 7, 1901—nearly 20 years after the sales of the mortgaged properties by the trustees under the prior mortgages—Raphael exhibited his bill against the new Wasatch Company, the Rio Grande Western, and the Union Trust Company, as trustee, to annul the sales made in 1881 under the prior mortgages, to be allowed to redeem from those mortgages, for an accounting on the part of the Rio Grande Western of the rents and profits of the railroads, to foreclose the second mortgage securing his bonds, and for general relief. Upon their own application the Central Trust Company and the Morton Trust Company were subsequently made parties defendant. The gravamen of the bill is that the trustees' sales in 1881 were fraudulent, that the fraud was concealed, that the complainant was an innocent purchaser of the second mortgage bonds of the new Wasatch Company, and that he did not discover the fraud until July, 1899. The principal criticisms made of the trustees' sale of the railroad of the Bingham Company, which is the only branch of the case necessary to be considered, are a failure to publish the notice of sale in such a newspaper as the mortgage con-

templated; that there was no default in the interest on the Bingham bonds, and the bonds were therefore not due; that no demand was made six months before the sale was noticed; that the notice of sale contained no sufficient recital respecting the maturity of the bonds and the amount claimed to be due; that the Bingham Company had deposited the $300,000 of bonds as collateral for a note for $200,000, and that, as long as the interest on the note was paid, no interest was to be paid on the bonds; that the interest was paid on the note; that the holder of the note and the collateral bonds unlawfully sold the bonds, thus paying the debt of the company; that the purchaser of the bonds thereupon at once unlawfully and fraudulently caused the trustees to foreclose the mortgage by notice and sale; that the trustees who took possession of the road fraudulently failed to apply the net earnings to the payment of the interest on the bonds; that the original holder of the bonds never lawfully foreclosed the pledge thereof, and he could not, therefore, vest a good title in the person who caused the mortgage to be foreclosed; that the Rio Grande Western and its predecessor, the Denver & Rio Grande Western, acquired title to the Bingham road with knowledge of the fraud and invalidity of the foreclosure proceedings, and that consequently their position was that of mortgagees in possession. When the Bingham road was sold by the trustees in 1881 and was deeded to the Denver & Rio Grande Western in 1882, it became incorporated in and a part of the railroad system of the latter company. The trustees' deed of conveyance, which recited the cause of foreclosure and the various steps taken by them, was recorded in the public records in Utah in 1882, and imparted notice to the world of its recitals. The grantee took possession under the deed in 1882, and it and its successor have ever since remained in the open, notorious, exclusive, adverse and continuous occupancy thereof. Such occupancy was under claim and color of title, and was accompanied by the payment of taxes. The railroad was practically reconstructed by its new owners. It was changed from a narrow to a standard gauge. It became, with the remainder of the system of which it was a part, subject to mortgages securing many millions of dollars of bonds which passed into the hands of innocent purchasers. If the trustees' sale of 1881 should be sustained against complainant's attack, the lien of the second mortgage which was given to secure the bonds held by him is concededly cut off and foreclosed. The company which originally owned the Bingham road, its officers and stockholders, the trustee of the second mortgage, and also the holders of the second mortgage bonds, all acquiesced for 18 years in the trustees' sale which cut off their rights and interests. If they were not fully informed of the proceedings connected with the foreclosure and sale by the trustees, they were intentionally ignorant. In 1899 the complainant, who was a lawyer, and a broker in defaulted securities, purchased 579 of these second mortgage bonds. They were of the face value of $579,000. To most of them there remained still attached all of the original interest coupons, those in default covering a period of 20 years. The bonds and matured coupons purchased by him amounted to more than $1,000,000. He paid for them less than $1,000. The prices paid by him varied from $1 to $1.85 per $1,000 bond with attached coupons. On $355,000 of the bonds the trustee's certificate was canceled when he bought them. He did not, before purchasing, seek to ascertain why this important evidence of genuineness, validity, and value was destroyed. An important participant in that which complainant afterwards denominated a fraud was one of the trustees who sold the Bingham road in 1881. Nevertheless complainant utilized his services in locating a portion of the bonds which he purchased. This same man had been the president of the new Wasatch Company, whose defaulted securities the complainant was gathering up, and his name appeared as such upon every bond. But complainant carefully avoided making inquiries which would have led to information. Before purchasing any of the defaulted bonds he examined some issues of a railroad manual including the one for the year 1882, and he read what appeared there concerning the affairs of the company which issued the bonds. In the publication of the year mentioned it was recited that the railroad was "recently purchased by the Denver & Rio Grande Western Railway Company." But he made no inquiry of that company as to the status of the securities which he contemplated purchasing; nor did he inquire of the Union Trust Company of New York, the trustee for

the holders of those securities—the trustee which had canceled its certificate upon $355,000 of bonds which he purchased. There were other obvious sources of information to one who desired to be informed, but they were purposely ignored by the complainant. When he had about completed his purchases, he became apprehensive that 18 years prior thereto a fraud had been committed upon the company and the original holders of the second mortgage bonds which he had just purchased for a nominal consideration. He claimed that thereupon, as an innocent purchaser, he made an investigation, and discovered for the first time the commission of a fraud, and its prior concealment. Failing to induce the Rio Grande Western to purchase his bonds and coupons, he instituted suit on January 7, 1901, nearly 20 years after the trustees' sale complained of. At the trial the complainant wholly failed to establish fraud either in the trustees' sale and conveyance of the Bingham road or in any of the acts of the parties or the proceedings of the trustees leading up to the same. Nor did there appear to have been the slightest concealment of what was actually done. After full hearing the Circuit Court dismissed the bill. The complainant died after perfecting his appeal to this court, and Martha Raphael, as administratrix of his estate, was substituted as appellant. The appellant's contentions in this court have been confined to the proceedings connected with the sale of the Bingham road, the other branch of the case having been abandoned.

Charles Locke Easton and F. W. Lehmann, for appellant.

Edward M. Shepard (Robert Harkness, William Mason Smith, and Adrian H. Joline, on the brief), for appellees.

Before SANBORN and HOOK, Circuit Judges.

HOOK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

There was no fraud in the sale of the railroad under the first mortgage. There was no concealment of what was done. All of the acts of the parties were characterized by that measure of openness and publicity which customarily marks the conduct of such affairs. Every one interested in or affected by the sale remained acquiescent for 18 years. In the meantime the rights of other parties attached, and extensive improvements were made on the property. Then came the complainant as a speculator in discarded opportunities for litigation. He purchased more than $1,000,000 of defaulted second mortgage securities for less than $1,000, and while doing so he turned his back to sources of information which thrust themselves upon his notice. His purchases made, he then investigated for fraud and technical defects in the proceedings resulting in the foreclosure of the first mortgage. Having failed to induce the present owner of the railroad, which rebuilt and improved it and made it valuable, to purchase peace and immunity from litigation, he sought, as an innocent purchaser, the aid of a court of chancery nearly 20 years after the making of the sale which he attacked. Even were the proceedings technically defective—a question which we do not find it necessary to consider—the right to challenge them was long since barred by the Utah statute of limitations. But, aside from the statute, the case of complainant is wholly devoid of equity. Those requirements of Lord Camden which have been so often approved and applied—conscience, good faith, and reasonable diligence —are wholly absent. The stability of property rights and the peace and repose of society are conserved by the prompt assertion of grievances. Delay for many years beyond the statutory period of limitation,

changes in value and condition, and the intervention of the rights of innocent third parties forbid their disturbance. It is obvious that the proper disposition of this appeal needs only the application of those principles of justice and equity to which all will assent without the citation of precedent or authority.

The decree of the Circuit Court will be affirmed.